1 | **JOHN C. ELLIS, JR.**
California State Bar No. 228083
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4 | E-Mail: john_ellis@fd.org

5 | Attorneys for Lawrence Doss (2)

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE JEFFREY T. MILLER)**

11 | UNITED STATES OF AMERICA, ) Case No. 08CR0650-02-JM
)
12 | Plaintiff, ) DATE: May 23, 2008
) TIME: 11:00 a.m.
13 | v. )
) STATEMENT OF FACTS AND
14 | LAWRENCE DOSS (2), ) MEMORANDUM OF POINTS AND
) AUTHORITIES IN SUPPORT OF
15 | Defendant. ) DEFENDANT'S MOTIONS
)
16 | _____ )

17 | **I.**

18 | **STATEMENT OF FACTS**

19 | The following statement of facts is based, in part, on materials received from the government.

20 | Mr. Doss does not accept this statement of facts as his own, and reserves the right to take a contrary position

21 | at motion hearings and trial. The facts alleged in these motions are subject to amplification and/or

22 | modification at the time these motions are heard.

23 | During the early morning hours of February 25, 2008, at approximately 6:15 a.m., Border Patrol

24 | Agents allegedly received an anonymous tip[1] that a group of "suspected illegal aliens"[2] were being loaded into

25 | a vehicle in the Mountain Empire Campground near space 13. Based on this tip, Agents Joseph Andrews,

26 | _____

27 | [1]    According to the ROI, the tip came from a "citizens [sic] report." If this is a known
28 | citizen informant, Mr. Doss hereby moves for the following discovery: one, the person's name, two, contact information, and three, all other times this person made a report and the results of that report.

[2]    Implicit in this comment is that the person saw Hispanics getting into a car. It is of no moment that a citizen thought that Hispanics getting into a car must be illegal aliens.

1  Ronald Roberts, Jason Feldman, and Romelio Rogel responded to the area.  Agents Andrews and Feldman

2  saw a vehicle that allegedly matched the car that the citizen saw Hispanics getting into.  The car was exiting

3  the campground.  Agents Andrews and Feldman stopped the vehicle from leaving, approached the vehicle,

4  and saw people "ducking down in the rear seat of the vehicle."  Thereafter, agents questioned the occupants,

5  opined that they were in the United States illegally, and arrested Mr. Doss.  According to the agents, Mr. Doss

6  made a post-arrest statement.

7          On March 5, 2008, the Government filed a nine-count indictment against Matthew Charles

8  Kennedy (1), Mr. Doss (2), and Sandra Bni (3).  Mr. Doss is only charged, in counts five and eight, which

9  alleged violations of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v) (II).

10         These motions follow.

11                                            **II.**

12                **SEVER MR. DOSS' CASE FROM HIS CO-DEFENDANT'S**

13         Mr. Doss hereby joins Ms. Bni's motion to sever defendants.[3]  Mr. Doss will supplement this motion

14  as more information arises.

15                                           **III.**

16                          **MOTION TO SUPPRESS STATEMENTS**

17         Mr. Doss moves to suppress any statements made at the time of his arrest on the grounds that his

18  Miranda waiver was not knowing, intelligent, and voluntary.  Moreover, Mr. Doss moves to suppress any

19  other statements made on the grounds that those statements were not made voluntarily.

20  **A.      The Government Must Demonstrate Compliance with Miranda.**

21         In order for any statements made by Mr. Doss to be admissible against him, the government must

22  demonstrate that they were obtained in compliance with Miranda v. Arizona, 384 U.S. 436 (1966).

23  Specifically, the government must establish that Mr. Doss waived his rights and that any waiver of his

24  Miranda rights was voluntary, knowing, and intelligent.  See Schneckloth v. Bustamonte, 412 U.S. 218

25  (1973).  When an interrogation continues without the presence of an attorney, and a statement results, the

26  government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his

27  _____

28         [3]      Ms. Bni does incorrectly indicates that Mr. Doss is charged along with Mr. Kennedy
        in the conspiracy count.  Mr. Kennedy is the only defendant charged in that count.

privilege against self-incrimination.  Miranda, 384 U.S. at 475.  The court must indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden on the government is great. United States v. Heldt, 745 F. 2d 1275, 1277 (9th Cir. 1984).

In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality of the circumstances surrounding the case.  Edwards v. Arizona, 451 U.S. 477 (1981); United States v. Garibay, 143 F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the validity of a Miranda waiver requires a two prong analysis:  the waiver must be both (1) voluntary and (2) knowing and intelligent.  Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990).  The second prong requires an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  Id. at 820-821 (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).  Not only must the waiver be uncoerced, then, it must also involve a "requisite level of comprehension" before a court may conclude that Miranda rights have been legitimately waived.  Id. (quoting Colorado v. Spring, 479 U.S. at 573).  Unless and until Miranda warnings and a knowing and intelligent waiver are demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used against the defendant.  Miranda, 384 U.S. at 479.  The government in this case must prove that Mr. Doss waived his rights intelligently and voluntarily.  Mr. Doss disputes any allegation that his waiver was knowing, intelligent, and voluntarily.

**B.      Mr. Doss's Statements Must Be Voluntary.**

Even if this Court determines that Mr. Doss validly waived his Miranda rights, it must still make a determination that any statements are voluntary.  Under 18 U.S.C. § 3501(a), this Court is required to determine, whether any statements made by Mr. Doss are voluntary.  In addition, section 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Doss understood the nature of the charges against him and whether he understood his rights.  Without such evidence, this Court cannot adequately consider these statutorily mandated factors.

Moreover, section 3501(a) requires this Court to make a factual determination.  Where a factual determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings.  See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important as the trial itself,'" id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be

1  supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's

2  responsive pleading.  Therefore, prior to admitting any alleged statements from Mr. Doss, a hearing must be

3  held to determine whether the statements were voluntary.

4  **IV.**

5  **SUPPRESS ALL EVIDENCE SEIZED IN VIOLATION OF THE FOURTH AMENDMENT.**

6      The Fourth Amendment  prohibits "unreasonable" searches and seizures. U.S. CONST. Amend. IV;

7  Terry v. Ohio, 392 U.S. 1, 20-21 (1968). The test of whether a seizure is reasonable entails a balancing of the

8  governmental interest that justifies the intrusion against the individual's privacy expectations and interests.

9  See Ferguson v. City of Charleston, 532 U.S. 67, 84 n.21 (2001); see also Mich. Dep't of State Police v. Sitz,

10  496 U.S. 444, 448-49 (1990).

11      The Fourth Amendment specifically prohibits unreasonable searches and seizures of a vehicle during

12  brief investigatory stops.  See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).  Moreover, an

13  officer may detain a motorist only upon a demonstration of "reasonable suspicion" of criminal activity.  See

14  United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Rodriguez, 976 F.2d 592, 594

15  (9th  Cir. 1992), amended 997 F.2d 1306 (9th Cir. 1993).  That "reasonable suspicion" must consist of

16  "specific, articulable facts which, together with objective and reasonable inferences, form the basis for

17  suspecting that the particular person detained is engaged in criminal activity." Rodriguez, 976 F.2d at 594

18  (citations omitted); see also United States v. Sigmond-Ballesteros, 285 F.3d 1117 (9th Cir. 2002).  A "gloss

19  on this rule prohibits reasonable suspicion from being based on broad profiles which cast suspicion on entire

20  categories of people without any individualized suspicion of the particular person to be stopped." Sigmond-

21  Ballesteros, 285 F.3d at 1121 (quoting United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir.

22  1994), (overruled in part on other grounds); see also United States v. Montero-Camargo, 208 F.3d 1122, 1131-

23  32 (9th Cir. 2000); United States v. Garcia-Camacho, 53 F.3d 244, 245-46 (9th Cir. 1995); United States v.

24  Mariscal, 285 F.3d 1127 (9th Cir. 2002).

25      A determination of whether an officer had "reasonable suspicion" of wrongdoing is "'not readily, or

26  even usefully, reduced to a neat set of legal rules.'"  Ornelas v. United States, 517 U.S. 690, 695-96 (1996)

27  (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)); see also United States v. Hernandez- Alvarado, 891 F.2d

28  1414, 1416 (9th Cir. 1989).  Rather, in making reasonable-suspicion determinations, the court must consider

1   the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and

2   objective basis" for suspecting criminal activity.  United States v. Cortez, 449 U.S. 411, 418 (1981); see also

3   United States v. Arvizu, 534 U.S. 266, 266 (2002) (holding that the "totality of the circumstances" inquiry of

4   an investigatory stop of a vehicle must be based on all factors, collectively, and not each in isolation).  While

5   this inquiry "includes the 'collective knowledge of the officers involved, and the inferences reached by

6   experienced, trained officers,'"  Hall, 974 F.2d at 1204 (other internal quotations omitted), this experience

7   may not be used to give the officers unbridled discretion in making a stop.  See Hernandez-Alvarado, 891 F.2d

8   at 1416; see also Florida v. J.L., 529 U.S. 266, 271 (2000) (finding that a tip from an anonymous informant

9   did not give rise to sufficient reasonable suspicion to perform a Terry stop).

10          In this case, the information and activities on which the arresting agents relied to make the

11  investigatory stop did not give rise to reasonable suspicion.  According to information provided by the

12  government, the only basis for seizing the vehicle was that a citizen saw a Hispanic people getting into a car.

13  This evidence is weak, over broad, and does not rise to the requisite level of individualized suspicion required

14  under the Fourth Amendment to seize and detain a person.  Thus, the agents lacked reasonable suspicion to

15  stop the car.  Therefore, because the agents lacked reasonable suspicion, all evidence flowing from the illegal

16  stop must be suppressed.  See Wong Sun v. United States, 371 U.S. 471 (1963).[4]

17                                                        **V.**

18          **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
19   **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
     **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
     **AMENDMENT BY DEPRIVING MR. DOSS OF THE TRADITIONAL FUNCTIONING OF THE**
20                                          **GRAND JURY**

21  **A.      Introduction.**

22          The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 11.  That

23  grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11,

24  2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is

25  attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the

26  instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously

27  _____

28          [4]     The requests to suppress evidence includes, but is not limited to, the material
        witnesses, and any statements or other evidence seized as a result of this unlawful stop.

                                                        5                                        08CR0650-02-JM

1  given in this district in several ways.[5]  These instructions compounded Judge Burns's erroneous instructions

2  and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately

3  preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy

4  of which is attached hereto as Exhibit B.[6]

5        **1.  Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

6

7

8        After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

9  responsibility, see Ex. A at 3, 3-4, 5,[7] Judge Burns instructed the grand jurors that they were forbidden "from

10  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

11  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

12  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

13  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

14  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

15  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

16  because the grand jurors disagree with a proposed prosecution.

17        Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

18  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

19        I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

20

21

22  _____

23     [5]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

24

25

26     [6]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr. Doss requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

27

28     [7]  See also id. at 20 ("You're all about probable cause.").

1  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

2  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

3  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

4        Examination of the recently disclosed voir dire transcript, which contains additional instructions and

5  commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

6  reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists

7  and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

8  merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his

9  earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

10  determination.

11        [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
          crime was committed?  And second, do we have a reasonable belief that the person that
12        they propose that we indict committed the crime?"

13        If the answer is "yes" to both of those, then the case should move forward.  If the answer
          to either of the questions is "no," then the grand jury should not hesitate and not indict.
14

15  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

16  term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

17  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

18  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

19  crime."

20        Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

21  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

22  Because of the redactions of the grand jurors' names, Mr. Doss will refer to them by occupation.  One is a

23  retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

24  CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

25  an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

26  cases.  See id.

27        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

28  CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

1  district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

2  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

3  simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want you to say,* "well, yeah, there's probable cause, but I still don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell me that.

9  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

10  juror know that he would not want him or her to decline to indict in an individual case where the grand juror

11  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

12  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

13  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

14  charge even if [the CSW] thought the evidence warranted it." See id.  Again, Judge Burns's question provided

15  no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small

16  amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

17  listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

18  them to vote "no bill" in the face of a showing probable cause.

19       Just in case there may have been a grand juror that did not understand his or her inability to exercise

20  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

21  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

22  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

23  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

24  considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.  We want you to make a business-like decision of whether there was a probable cause. . . .

28

1   Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

2   on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

3        In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

4   That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

5   juror is obligated to vote to indict if there is probable cause.

6        I can tell you sometimes I don't agree with some of the legal decisions that are indicated
           that I have to make. But my alternative is to vote for someone different, vote for someone
7        that supports the policies I support and get the law changed. It's not for me to say, "well,
           I don't like it. So I'm not going to follow it here."

8

9        You'd have a similar obligation as a grand juror even though you might have to grit your
           teeth on some cases. Philosophically, if you were a member of congress, you'd vote
           against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote
10       against criminalizing some drugs.

11        That's not what your prerogative is here. You're prerogative instead is to act like a judge
           and say, "all right. This is what I've to deal with objectively. Does it seem to me that a
12       crime was committed? Yes. Does it seem to me that this person's involved? It does." *And
           then your obligation, if you find those to be true, would be to vote in favor of the case going
13       forward.*

14   Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both

15   questions are answered in the affirmative, lead to an "obligation" to indict.

16        Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

17   paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

18   to indict in every case in which there was probable cause.

19        The Court: Do you think you'd be inclined to let people go in drug cases even though you

20        were convinced there was probable cause they committed a drug offense?

21        REA: It would depend on the case.

22        The Court: Is there a chance that you would do that?

23        REA: Yes.

24        The Court: I appreciate your answers. I'll excuse you at this time.

25   Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

26   political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

27   should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

28   indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns

1   made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

2   hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

3   because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[8]

4   See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

5   a risk to run.

6   **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer**

7   **Exculpatory Evidence.**

8           In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

9   grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex.

10  A at 20.[9]

11  _____

12      [8] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate

13  judge will have determined the existence of probable cause "in most circumstances" before it has
    been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding

14  probable cause in each case because had a magistrate judge not so found, the case likely would not
    have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it

15  merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction
    made the grand jury more inclined to indict irrespective of the evidence presented.

16

17      [9] These instructions were provided in the midst of several comments that praised the United
    States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they

18  "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be
    honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The

19  instructions delivered during voir dire go even further.  In addressing a prospective grand juror who
    revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38,

20  Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even
    while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense

21  to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith
    to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict

22  innocent people or people that they believe to be innocent or the evidence doesn't substantiate the
    charges against.").

23
        Judge Burns's discussion of his once having been a prosecutor before the Grand Jury

24  compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.
    Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id.

25  at 8, he would not allow the government attorneys to act inappropriately or to present cases for
    indictment where no probable cause existed.

26
        In addition, while Judge Burns instructed the Grand Jury that it had the power to question

27  witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the
    U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought to be

28  asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's

1  |  Now, again, this emphasizes the difference between the function of the grand jury and the
2  |  trial jury. You're all about probable cause. If you think that there's evidence out there that
   |  might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
   |  you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
3  |  *duty-bound to present evidence that cuts against what they may be asking you to do if*
   |  *they're aware of that evidence.*

4

5  Id. (emphasis added).

6         The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7  "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

8  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9  adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus,

10 Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

11 "adverse" or "that cuts against the charge." See id.

12 **B.      Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers**
   |  **of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
13 |  **During Impanelment.**

14         The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15 grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

16 Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

17 approach[10] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

18 the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand

19 jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January

20 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

21 bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

22

23 independence is diluted by [such an] instruction, which encourages deference to prosecutors."
   |  Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice,"
24 |  see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions
   |  provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow
25 |  instructions because, in fact, we are prohibited from examining jurors to verify whether they
   |  understood the instruction as given and then followed it.").
26

27 |  [10]   See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
   |  majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28 |  imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
   |  constitutional independence.").

1  exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  <u>See</u> <u>United</u>

2  <u>States v. Williams</u>, 504 U.S. 36, 49 (1992).

3       For instance, with respect to the grand jury's relationship with the prosecution, the <u>Navarro-Vargas</u>

4  <u>II</u> majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

5  deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

6  as a grand jury.'"  <u>Navarro-Vargas II</u>, 408 F.3d at 1200 (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 510

7  (1978)).  <u>Accord</u> <u>United States v. Navarro-Vargas</u>, 367 F.3d 896, 900 (9th Cir. 2004) (<u>Navarro-Vargas</u>

8  <u>I</u>)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

9  prosecutorial." ).  <u>See also</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

10  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, <u>id.</u>, but

11  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

12  prosecutor." <u>Id.</u>  <u>See</u> Niki Kuckes, <u>The Democratic Prosecutor:  Explaining the Constitutional Function of</u>

13  <u>the Federal Grand Jury</u>, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

14  "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

15  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., <u>Criminal Procedure</u>

16  § 15.2(g) (2d ed. 1999)).

17       Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth

18  in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See id.</u>

19  
20       The grand jury thus determines not only whether probable cause exists, but also whether
     to "charge a greater offense or a lesser offense; numerous counts or a single count; and
     perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis
     of the same facts.  And, significantly, the grand jury may refuse to return an indictment

21       even "'where a conviction can be obtained.'"

22  <u>Id.</u> (quoting <u>Vasquez</u>, 474 U.S. at 263).  The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of

23  the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury "controls

24  not only the initial decision to indict, but also significant questions such as how many counts to charge and

25  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

26  crime." <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263).  Judge Hawkins notes that the <u>Navarro-Vargas II</u>

27  majority accepts the major premise of <u>Vasquez</u>: "the majority agrees that a grand jury has the power to refuse

28  to indict someone even when the prosecutor has established probable cause that this individual has committed

1 a crime." <u>See id.</u> at 1214 (Hawkins, J. dissenting).  <u>Accord</u> <u>Navarro-Vargas I</u>, 367 F.3d at 899 (Kozinski, J.,

2 dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

3 dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

4 But not in Judge Burns's instructions.

5 **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established**
     **in Both *Vasquez* and *Navarro-Vargas II*.**

6

7      The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

8 jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

9 in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every

10 finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at

11 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

12 pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of

13 the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors,

14 and thus to circumscribe the grand jury's constitutional independence.").  <u>See also</u> <u>id.</u> ("The 'word' should is

15 used to express a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u> 1579

16 (1999) (brackets in original)).

17      The debate about what the word "should" means is irrelevant here; the instructions here make no

18 such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

19 choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

20 disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

21 indicting even though I think that the evidence is sufficient'...."  <u>See</u> Ex. A at 8-9.  Thus, the instruction flatly

22 bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

23 would read this language as instructing, or even allowing, him or her to assess "the need to indict."  <u>Vasquez</u>,

24 474 U.S. at 264.

25      While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

26 an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, in context, it is clear that he could only

27 mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

28 only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

1  probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would

2  strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

3  jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was

4  not.

5      The full passage cited above effectively eliminates any possibility that Judge Burns intended the

6  Navarro-Vargas spin on the word "should."

7      [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
       crime was committed? And second, do we have a reasonable belief that the person that
8      they propose that we indict committed the crime?"

9      If the answer is "yes" to both of those, then the case should move forward. If the answer
       to either of the questions is "no," then the grand jury should not hesitate and not indict.

10  See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that

11  if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e]

12  room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205

13  (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the

14  innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities

15  continue to include both the determination whether there is probable cause and the protection of citizens

16  against unfounded criminal prosecutions.") (citation omitted).

17      By the same token, if Judge Burns said that "the case should move forward" if there is probable

18  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

19  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

20  two different meanings of the word "should" in the space of two consecutive sentences. That could not have

21  been his intent. But even if it were, no grand jury could ever have had that understanding.[11] Jurors are not

22  presumed to be capable of sorting through internally contradictory instructions. See generally United States

23  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

24  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

25

26  ――――――――――

27      [11] This argument does not turn on Mr. Doss's view that the Navarro-Vargas/Marcucci reading
        of the word "should" in the model instructions is wildly implausible. Rather, it turns on the context
28      in which the word is employed by Judge Burns in his unique instructions, context which eliminates
        the Navarro-Vargas/Marcucci reading as a possibility.

1        Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

2 clear to the grand jurors that "should" was not merely suggestive, but obligatory:

3     **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

4 and excused a potential juror (CSW):

5     The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want

6     you to say, "Well, yeah, there's probable cause.  But I still don't like what the government

7     is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's

8     your frame of mind, then probably you shouldn't serve.  Only you can tell me that.

9     Prospective Juror: Well, I think I may fall in that category.

10     The Court: In the latter category?

11     Prospective Juror: Yes.

12     The Court: Where it would be difficult for you to support a charge even if   you thought the

13     evidence warranted it?

14     Prospective Juror: Yes.

15     The Court: I'm going to excuse you then.

16 See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

17 juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

18 "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

19 wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

20 was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

21 the exercise of discretion by any other prospective grand juror.

22     **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it

23 there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

24 Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

25     You'd have a similar *obligation* as a grand juror even though you might have to grit your
    teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote

26     against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote
    against criminalizing some drugs.

27

28     That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and
    to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that
    a crime was committed?  Yes.  Does it seem to me that this person's involved? It does."

1    *And then your obligation, if you find those things to be true, would be to vote in favor of
2    the case going forward.*

3    <u>Id.</u> at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

4    were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

5    convinced there was probable cause they committed a drug offense?" <u>Id.</u> at 27. The potential juror responded:

6    "It would depend on the case." <u>Id.</u> Nevertheless, that juror was excused. <u>Id.</u> at 28. Again, in this context, and

7    contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the juror has no

8    prerogative to do anything other than indict if there is probable cause.

9         Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

10   a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but

11   rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not

12   indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the

13   prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

14   scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the

15   prospective jurors, because his message is that there is no discretion not to indict.

16        **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point

17   home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

18   on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws

19   here." <u>See id.</u> at 61.

20        **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in

21   every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

22   reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

23   that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what

24   the law ought to be and try to impose that through applying it in a grand jury setting." <u>See</u> Ex. A at 9.

25        Moreover, Judge Burns advised the grand jurors that they were forbidden from considering the

26   penalties to which indicted persons may be subject.

27        Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case
         is about because there is a disparity between state and federal law.

28        The Court: In what regard?

Prospective Juror: Specifically, medical marijuana.

The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

1   id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent

2   structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

3   jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

4   therefore be dismissed. Id.

5          The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

6   instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

7   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

8   408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand

9   jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at

10  1202 (emphases in the original).

11         Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

12  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

13  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The

14  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

15  making a probable cause determination . . . unconstitutionally undermines the very structural protections that

16  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

17  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

18  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

19  in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

20  instructions because nothing will happen if they disobey them." Id.

21         In setting forth Judge Hawkins' views, Mr. Doss understands that this Court may not adopt them

22  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

23  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

24         Here, again, the question is not an obscure interpretation of the word "should", especially in light of

25  the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

26  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

27  right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

28  Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

1   Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

2   they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

3   prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." <u>See</u> Ex.

4   A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

5   grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

6   of the community.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

7   exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches of government

8   by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d 1061, 1066 &

9   n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

10   initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and, here, Judge

11   Burns has both fashioned his own rules and enforced them.

12   **D.      The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present
          Exculpatory Evidence to the Grand Jury.**

13

14   In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

15   argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

16   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

17   common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

18   judicial authority exists." <u>See</u> <u>id.</u> at 47.  Indeed, although the supervisory power may provide the authority

19   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

20   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

21   Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does

22   not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47

23   (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative,

24   rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's claim, both

25   as an exercise of supervisory power and as Fifth Amendment common law. <u>See</u> <u>id.</u> at 51-55.

26   Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

27   present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

28   Now, again, this emphasizes the difference between the function of the grand jury and the
       trial jury.  You're all about probable cause.  If you think that there's evidence out there that

1  might cause you say "well, I don't think probable cause exists," then it's incumbent upon

2  you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*

   *duty-bound to present evidence that cuts against what they may be asking you to do if*

   *they're aware of that evidence*.

3

4  Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

5  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

6  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See

7  id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

8  Navarro-Vargas, 408 F.3d at 1207.

9       This particular instruction has a devastating effect on the grand jury's protective powers, particularly

10 if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

11 conveyed by the previous instruction: "You're all about probable cause."  See Ex. A at 20.  Thus, once again,

12 the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

13 probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

14 would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

15 should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

16 will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

17 cause, but, if none is presented by the government, they can presume that there is none.  After all, "in most

18 instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

19 you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the

20 jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that

21 cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15

22 (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the

23 "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from

24 of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See

25 Ex. A at 27.

26      These instructions create a presumption that, in cases where the prosecutor does not present

27 exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

28 exculpatory evidence was presented, would proceed along these lines:

1      (1)    I have to consider evidence that undercuts probable cause.

2      (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

3              evidence to me, if it existed.

4      (3)    Because no such evidence was presented to me, I may conclude that there is none.

5  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

6  presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

7  prosecutor would have presented it.

8      The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

9  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

10  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

11  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

12  the Fifth Amendment.

13  <center>**VI.**</center>

14  <center>**<u>REQUEST FOR LEAVE TO FILE FURTHER MOTIONS</u>**</center>

15      Mr. Doss anticipates filing further motions in this case in response to reviewing the recently provided

16  discovery.  Additionally, as new information surfaces due to the government providing discovery in response

17  to these motions, or an order of this Court, it may be necessary to file further motions, or to supplement

18  existing motions with additional facts.  The denial of this motion will result in a violation, at a minimum, of

19  Mr. Doss's Fifth and Sixth Amendment rights.  Therefore, defense counsel requests the opportunity to file

20  further motions based upon information gained from discovery.

21  <center>**VII.**</center>

22  <center>**<u>CONCLUSION</u>**</center>

23      For the reasons stated above, Mr. Doss moves this Court to grant his motions.

24      Respectfully submitted,

25  DATED:  May 12, 2008          *s/ John C. Ellis, Jr.*

26      **JOHN C. ELLIS, JR.**
    Federal Defenders of San Diego, Inc.

27      Attorneys for Mr. Doss
    John_Ellis@fd.org

28