JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California  92101-6128
Telephone No. (619) 699-5995
Attorney for Defendant KENNEDY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JEFFREY T. MILLER)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Criminal No. 08CR0650JTM |
| | ) |
| Plaintiff, | ) |
| | ) Date: May 23, 2008 |
| | ) |
| | ) Time: 11:30 a.m. |
| v. | ) |
| | ) |
| | ) **MOTION FOR DISCOVERY;** |
| **MATTHEW WILLIAM KENNEDY** | ) **MOTION TO DISMISS FOR LACK OF** |
| | ) **PROBABLE CAUSE; MOTION TO SUPPRESS** |
| | ) **EVIDENCE AND STATEMENTS; MOTION** |
| | ) **FOR WIRETAP EVIDENCE;** |
| | ) **MOTION FOR JOINDER; MOTION TO** |
| | ) **SUPPRESS IDENTIFICATION; MOTION** |
| | ) **FOR LEAVE TO FILE FURTHER** |
| | ) **MOTIONS** |
| _____ | ) |

TO:      KAREN HEWITT, UNITED STATES ATTORNEY, and
         STEVEN DESALVO, ASSISTANT UNITED STATES ATTORNEY, and
         JOHN ELLIS, ATTORNEY FOR DEFENDANT for LAWRENCE DOSS;
         SHAUN  KHOJAYAN,  JR., ATTORNEY FOR DEFENDANT SANDRA BNI
         LINDA KING for the MATERIAL WITNESSES

   On Tuesday, May 23, 2008 at 11:30 a.m., or as soon thereafter as

counsel may be heard, defendant, Matthew William Kennedy, by and through

his attorney, Kerry Bader, will ask this Court to enter an order granting

the motions listed below.

May 19, 2008                          /s/Joan Kerry Bader

                                      JOAN KERRY BADER

<u>**MOTIONS**</u>

Defendant, Matthew William Kennedy, by and through his attorney, Kerry Bader, pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law and local rules, hereby presents the following motions

1. To dismiss the Indictment;

2. To compel discovery;

3. To suppress statements and evidence;

4. Motion to suppress identification;

5. Motion for wiretap evidence;

6. Motion for joinder and

7. Motion for leave to file further motions.

This motion is based upon the notice of motions, the statement of facts and memorandum of points and authorities, and any and all other materials that may come to this Court's attention at the time of the hearing on these motions.

Respectfully submitted,

Dated: May 19, 2008                    <u>/s/Joan Kerry Bader</u>
                                       JOAN KERRY BADER
                                       Attorney for Mr. Kennedy

1

2  JOAN KERRY BADER
   California State Bar No. 172586
3  964 Fifth Avenue, Suite 214
   San Diego, California  92101-6128
4  Telephone No. (619) 699-5995
   Attorney for Defendant KENNEDY

5
                    UNITED STATES DISTRICT COURT
6
                  SOUTHERN DISTRICT OF CALIFORNIA
7
                    **(HONORABLE JEFFREY T. MILLER)**
8

9  UNITED STATES OF AMERICA,      )  Criminal No. 08CR0650JTM
                                  )
10          Plaintiff,            )
                                  )
11 v.                             )
                                  )
12 MATTHEW WILLIAM KENNEDY,       )  DEFENDANT'S MEMORANDUM OF POINTS
                                  )  AND AUTHORITIES
13          Defendant.            )
                                  )
14                                )
                                  )
15 _____ )
                                     **I.**
16
                    **PRELIMINARY STATEMENT**
17
        The Defendant, Mr. Kennedy has been charged with Title 8, USC
18
   section 1324(a)(2)(B)(ii), Harboring Illegal Aliens, 8 USC section
19
   1324(a)(1)(A)(iii) and (v), Conspiracy, 18 USC section 371 and 18 USC
20
   section 2, Aiding and Abetting each of the substantive counts.
21
        On February 25, 2008, Lawrence Doss, was arrested in a vehicle
22
   near the entrance to the Mountain Empire Campground with at least six
23
   undocumented persons within the vehicle.  Mr. Kennedy and co-defendant Bni
24
   were arrested in a trailer (one of many) in the Mountain Empire Campground
25
   by United States Border Patrol Agents, at about 6:30 in the morning.
26
   Sandra Bni was also in the trailer.
27
        According to the agents report, the Border Patrol assigned to
28
   the El Cajon Station received a citizen's report of a group of suspected

illegal aliens loading into a vehicle near Space 13 at the Mountain Empire Campground.   Agents went to the campground and looked for the suspect vehicle described as a sedan with black metallic paint.   The supposedly saw a matching vehicle leaving the campground.   Two agents contacted the driver and saw numerous passengers ducking down in the rear of the vehicle.   They questioned the people as to their immigration status and allegedly received admissions.

Two other agents went to the trailer located at Space 13 where the campground manager was encountered, according to the reports.   The campground manager, Shawn Wallace, supposedly heard over the Border Patrol's radio that a car had been seized at the exit of the campground and that it

was loaded with six illegal aliens from Mexico.   Wallace overheard the conversation on the radio and granted BPA Rogel and FOS Roberts permission to enter the trailer located at Space 13.   BPA Rogel and FOS Roberts approached the trailer, knocked on the door and were greeted by a man BPA Rogel recognized as Kennedy, Matthew, a prolific smuggler within the El Cajon Border Patrol Station Area of Operations.   BPA Rogel and FOS Roberts identified themselves as United States Border Patrol Agents and informed Kennedy that a citizen had seen a group of possible illegal aliens leave the trailer and get inside of a vehicle that was parked in Space 13.   Kennedy advised that there was no one else inside the trailer besides himself and his girlfriend.   BPA Rogel asked for and was granted consent to enter the premises ans search for more illegal aliens by Matthew Kennedy.   BPA Rogel then asked Kennedy and his girlfriend, now identified as Sandra Mae Bni, to step out of the trailer.   With Kennedy's consent, the Agents entered the trailer and discovered two additional subjects attempting to conceal themselves in the shower area of the bathroom inside the trailer.   BPA Rogel and FOS Roberts identified themselves as United States Border Patrol Agents and questioned the two subjects as to their immigration status.   Both citizens stated that they were citizens and nationals of Mexico illegally present in the United States.   BPA Rogel and FOS Roberts arrested the two illegal aliens.   BPA Rogel and FOS Roberts also arrested BNI and Kennedy for Harboring Illegal Aliens.

According to the Complaint, the three material witnesses that

were held by the Border Patrol and subsequently released on bond by order of Judge Nita Stormes, did not identify Mr. Kennedy as someone involved in their smuggling venture.

The government has provided discovery that another person who was found kneeling in the front seat of the car which Lawrence Doss was driving was interviewed by the Border Patrol. According to the discovery, her name is Maria Esperanza Martinez-Contreras. In a taped DVD interrogation, Ms. Martinez advised the agents she has lived in the United States for 25 years, her parents are here as Permanent Residents, her sister is a United States citizen, she herself has a work permit to remain in the United States.

The written discovery indicates Ms. Martinez did not identify Mr. Kennedy in a photo line up.

Among other things, Ms. Martinez said in the video-taped interview she says her parents, three of her children and her ex-husband and her sister-in-law all live within the United States.

Specifically, the agent asked her at one point:

Did you get anything to eat while you were there?

Ms. Martinez: No.

Agent: Did you get anything to drink.

Ms. Martinez: No.

Agent: Did anyone else eat or drink?

Ms. Martinez: No.

Agent: That's not what we are being told by the others.

Ms. Martinez: I think they just drank some water.

Agent: You did not drink any water?

Ms. Martinez: I did not but someone arrived at midnight. An American with a bag of chips, beans and some vegetables. I ate

some of that.

Agent: A man or a woman?

Ms. Martinez: A man.

Agent: .......  Where did you sleep?

Ms. Martinez: On the floor.

Agent: Who told you where to sleep?

Ms. Martinez: We just went to sleep without anyone telling us where to go.

Agent:....  What time did you leave in the morning?

Ms. Martinez: Around 7:00 a.m.

Agent: You left at around 7:00 a.m. and who told you about leaving?

Ms. Martinez: The American told us.

Agent: What did he specifically tell you?

Ms. Martinez: That we were leaving.

Agent: To the U.S.

Ms. Martinez: About one hour.

Agent: When you went out was there a car waiting for you?

Ms. Martinez: Yes.

Agent:......  Did the American man instruct the others in the group where to specifically go inside the car?

Ms. Martinez: He went out and I was the last one to go out because I was going to sit up front.

Agent: You were on your knees and who told you to go that way?

Ms. Martinez: The other man.

Agent: The American man (blonde) who told you to get in?

Ms. Martinez: Yes.

Agent: The one who brought the food or the driver.

Ms. Martinez: The one who brought the food.  He told me to get on my knees.  We did not get far.

The agent then asked her is she thought the American woman in the trailer thought she was illegal.  The woman said she did not know because "you don't know who you are dealing with."

Agent: When you entered the house you were a complete stranger to her and she did not react or ask why you were there.  Did you feel like they were waiting for you?

Ms. Martinez: I believe so.

Agent: Did the American who brought you food know you were illegal?

Ms. Martinez: I believe so, he spoke to the others and told them when they would be leaving I was expecting to go in the evening.

Agent: He spoke to what people, other smugglers or the group

Ms. Martinez: The group.  He told us we would be leaving today.

Ms. Martinez advised the agent that she had been instructed by the walking guide to pay the driver of the car.  She also said the American woman in the trailer did not speak nor say anything and she turned the lights off and went to sleep.  She also said she never asked to use the bathroom, she just used it.  They never asked for or were given blankets, they just took one they found.

When asked if she could recognize people in photos (that have not been given to the defense), she pointed out someone who brought the food, the driver of the car and the woman at the house.

The agent then asked if she had seen these people again, and she said, "Yes, they are here with us.  I am not sure ..."

The agent then said: Is he here with you. Was he arrested?

Ms. Martinez responded: I have not seen him.

The agent then said: Did he get arrested when you were arrested?

Ms. Martinez said: Yes.

The agent then asked her: Maria, did we promise you anything, make any threats against you to speak with us?

Ms. Martinez: No.

Upon his arrest at the Border Patrol Station, which sounds as if it is in Santee, California, Mr. Kennedy was placed apart from the other material witnesses. He was told to sit on a bench across from the room where the other witnesses and defendants were placed. There were large glass windows so they could see him on the bench. Right across from him, maybe four feet, was one female material witness who sat alone for approximately three to four hours, across from him. Mr. Kennedy sat there all day into the evening, and he watched as each person was taken out of the room and into the interrogation rooms.

When they asked if she had seen these people again, and she said, "yes, they are here with us. I am not sure ..."

The agent then said: "Is he here with you. Was he arrested?"

Ms. Martinez responded: "I have not seen him."

The agent then said: "Did he get arrested when you were arrested?"

Ms. Martinez said: "Yes."

Ms. Martinez was not held as a Material Witness and was released by the Border Patrol, presumably because she is lawfully in the United States. The defense has asked the AUSA various times to provide the location of this witness so that she can be interviewed but the

government has failed to cooperate with the request.

Finally, the government has charged Mr. Kennedy in other counts stemming from interrogations by the Border Patrol on four other dates, including, January 13, 2008, January 27, 2008, February 7, 2008 and February 14, 2008. The stop of the vehicles, the statements and the release of the "material witnesses" in those cases will be addressed in turn below, and they will include a motion to dismiss these counts.

## II.

### MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Kennedy, through counsel, has received some discovery in this case.

Accordingly, Mr. Kennedy moves for the production of the following discovery. *This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies."* See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989). This request includes any and all "***ancillary files***" in the custody of any governmental agency or entity involved in this case.

Finally, the defense requests that the Government hand over any and all recordings (oral or visual) of the Border Patrol activity surrounding his arrest, including but not limited to surveillance videos, radio transmissions, dispatch communications or audio recordings, including those that were allegedly overheard by the campground manager.

(1) <u>The Defendant's Statements</u>. The government must disclose to the defendant <u>all</u> copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which

7

the government intends to offer in evidence at trial; any response by the defendant to interrogation either at the trailer, in the Border Patroal vehicle in which he was transported or at the Border Patrol Station; the substance of any oral statements which the government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the government agent; any response to any <u>Miranda</u> warnings which may have been given to the defendant; as well as any other statements by the defendant.  Fed. R. Crim. P. 16(a)(1)(A).  The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

*Counsel for Mr. Kennedy requests any and all of these items at least two weeks before any evidentiary motion hearing, and in the alternative, asks the Court to deem <u>anything that is disclosed to the defense just on the eve of such hearing as untimely</u>.*

(2)  <u>Arrest Reports, Notes and Dispatch Tapes</u>.  The defendant also specifically requests the government to turn over all arrest reports, notes, dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to, any rough notes, records, reports, transcripts, audio or video or dispatch tapes or DVDs or other documents in which statements of the defendant or any other discoverable material is contained.  Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant. <u>See</u> Fed.

R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(I).

(3) <u>Brady Material</u>.  The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case.  Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985), <u>on remand to</u>, 798 F.2d 1297 (9th Cir. 1986); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

(4) <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The government must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request includes any cooperation or attempted cooperation by the defendant as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines.  The defendant also requests any information relevant to the appropriate Guideline to be utilized in this case.

(5) <u>The Defendant's Prior Record</u>.  The defendant requests a copy of his prior record.  Fed. R. Crim. P. 16(a)(1)(B).

(6) <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.  The defendant requests that such notice be given four weeks before trial in order to give the defense time to adequately investigate and prepare for trial.

1

2          (7)  <u>Evidence Seized</u>.  The defendant requests production of

3  evidence seized as a result of any search, either warrantless or with a

4  warrant.  Fed. R. Crim. P. 16(a)(1)(C).

5          (8)  <u>Request for Preservation of Evidence</u>.  The defendant

6  specifically requests the preservation of all dispatch tapes, audio or

7  video tapes, or any other physical evidence that may be destroyed, lost,

8  or otherwise put out of the possession, custody, or care of the government

9  and which relate to the arrest or the events leading to the arrest in this

10  case.

11          Mr. Kennedy asks that all notes taken from interviews related

12  to this case be preserved.  He asks that any and all recordings of his

13  statements be given to the defense immediately.  Mr. Kennedy has been

14  extensively  interviewed  by  various  agents  and  given  that  most

15  interrogations are now recorded, those should have been preserved.  They

16  are of value not only for pre-trial hearing purposes but for trial and any

17  possible sentencing hearings.

18          In addition, Mr. Kennedy requests that the Assistant United

19  States Attorney assigned to this case personally review *all personnel*

20  files of each agent involved in the present case for impeachment material.

21  <u>Kyles v. Whitley</u>, 115 S. Ct. 1555 (1995); <u>United States v. Henthorn</u>, 931

22  F.2d 29 (9th Cir. 1991), <u>appeal after remand</u>, 985 F.2d 575 (9th Cir.

23  1992).

24          (9)  <u>Tangible Objects</u>.  The defendant requests the opportunity

25  to inspect and copy as well as test, if necessary, all other documents and

26  tangible  objects,  including  photographs,  books,  papers,  documents,

27  fingerprint analyses, computers, or copies of portions thereof, which are

28  material  to  the  defense  or  intended  for  use  in  the  government's

case-in-chief or were obtained from or belong to the defendant. Fed. R. Crim. P. 16(a)(2)(C).

(10) <u>Evidence of Bias or Motive to Lie</u>. The defendant requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony, including but not limited to, the agents involved in the arrest.

*The defense specifically asks the Court to provide the defense with copies of the material witnesses A files and criminal records.*

There is one witness, who allegedly implicates Mr. Kennedy, as described above, who is supposedly lawfully in the United States but her presence at the arrest scene cause one to pause and her A file and rap sheet and any civil actions which may well lead to impeachment material.

(11) <u>Impeachment Evidence</u>. The defendant requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant, including but not limited to, the agents involved in the arrest. <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>, <u>supra</u>.

(12) <u>Evidence of Criminal Investigation of Any Government Witness</u>. The defendant requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct, including but not limited to, the agents involved in the arrest.

*According to AUSA Steven DeSalvo there is a unnamed cooperating witness in this case and the defense requests any and all relevant evidence concerning this individual or individuals.*

(13) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>.  The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic including but not limited to, the agents involved in the arrest.

(14) <u>Witness Addresses</u>.  The defendant requests the name and last known address of each prospective government witness, including expert witnesses.  The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a government witness.

(15) <u>Name of Witnesses Favorable to the Defendant</u>.  The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged.

(16) <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement relevant to any possible defense or contention that he might assert.

(17) <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid delays at the request of defendant to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is

sufficient for the report or notes to qualify as a statement under § 3500(e)(1). <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963). In <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

(18) <u>Giglio Information</u>. Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any government witnesses, in exchange for their testimony and/or cooperation in this case, and all other information which could arguably be used for the impeachment of any government witnesses. This includes tax returns and remuneration given to cooperating witnesses and agents, and any other item, tangible or intangible that indicates was given or offered to a witness in exchange for his or her cooperation, such as any and all gifts, favors, and lenient treatment given to such persons or their family members or friends. Lenient treatment includes but is not limited to favorable plea agreements, sentencing recommendations, grants of visas or other immigration benefits, preferred placement and treatment in the incarceration context and preferential bond recommendations. This request also extends to but is not limited to any modifications, assistance or forgiveness given by the government to a witness including any debt or tax relief or other compensation.

(19) <u>Agreements Between the Government and Witnesses</u>. The defendant requests discovery regarding any express or implicit promise, understanding, offer of immunity in any forum and jurisdiction, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal

or civil income tax, forfeiture or fine liability, between any prospective government witness and the government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed.

(20) <u>Informants and Cooperating Witnesses</u>. The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant[s] who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Kennedy. The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. The defense needs the information so that it may prepare to defend the case. Without the names and information that these people are allegedly supplying, there can be no meaningful preparation or defense or trial, and will result in various constitutional violations. <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62 (1957). The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

(21) <u>Bias by Informants or Cooperating Witnesses</u>. The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness. <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities. In addition, Mr. Kennedy requests any and all evidence of any witness' inability to tell the truth, any and all investigations or arrests or convictions and any and all

medical, psychological, drug or alcohol-related problems.

(22) <u>Residual Request</u>.  Mr. Kennedy intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  Mr. Kennedy requests that the government provide him and his attorney with the above requested material sufficiently in advance of a substantive motion hearing and/or trial to avoid unnecessary delay prior to cross-examination.

**III.**

**THERE WAS NO PROBABLE CAUSE WARRANTING AN INTRUSION ON THE TRAILER NOR WAS THERE PROBABLE CAUSE TO ARREST MR. KENNEDY, AS SUCH, THE INDICTMENT SHOUDL BE DISMISSED, OR, ALL EVIDENCE AND STATEMENTS SHOULD BE SUPPRESSED**

The Fourth Amendment of the United States Constitution prohibits searches and seizures without probable cause.  <u>Beck v. Ohio</u>, 379 U.S. 89 (1964).  The standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion.  <u>Berger v. New York</u>, 388 U.S. 41 (1967).  What happened here was an unlawful arrest, based on no probable cause, and an unlawful search

The Constitutional validity of the search...must depend upon the constitutional validity of the petitioner's arrest..  Whether that arrest was constitutionally valid depends on the circumstances within their knowledge and of which they had reasonably trustworthy information [which was] sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.  <u>Brinegar v. United States</u>, 338 U.S. 160, 175-176 (1949).

The "good faith on the part of the arresting officers" is not enough.  <u>Henry v. United States</u>, 361 U.S. 98, 102.  If subjective good

faith alone were the test, the protections fo the Fourth Amendment would

evaporate, and the people could be "secure in their persons, houses,

papers, and affects," only in the discretion of the police." Beck v. Ohio,

379 U.S. 89, 97 (1964).

In <u>Beck</u> the police stopped the defendant in his automobile

> [b]ut there was nothing that would
> indicate that any informer had said that the petitioner could
> be found at any time an place. Cf. Draper v. United States,
> 358 U.S. 307. And the record does not show that the officers
> saw the petitioner "stop" before they arrested him, or that
> they saw, heard, smelled or otherwise perceived anything else
> to give them ground for belief that the petitioner had acted
> or was then acting unlawfully. <u>Id.</u> at 93-94.

Likewise here were no facts stating that the agents were told

who was doing what and where, so there was no support for probable cause

to go into the trailer. All the agents had heard was there was a car

being loaded with possible undocumented people near Space 13 which was

already apprehended as a car full of aliens which the agents supposedly

knew because of their radio transmission. If the radio transmissions are

not provided in discovery, the basis of this arrest is even less legally

tenable: the car was at the exit of the park, probably a distance of

several hundred yards, with various trailers, many vehicles and trees,

bushes and a creek between the trailer and the exit. There was no way

to see the exit of the park much less the car, particularly given that

the agents at the trailer could not even report the stop of the car or

the seizure of the occupants. The distance is possibly as much as one

and a half to two blocks between the two different locations.

Thus, there was no cause to arrest or interrogate the occupants

of the trailer, nor was there reason or cause to interrogate or to enter

and search the trailer. The agents should have tried to secure a search

warrant.

> As the Supreme Court has said, This Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with the evidence. Searches conducted without warrants have been held unlawful notwithstanding facts unquestionably showing probable cause. <u>Arguello v. United States</u>, 269 U.S. 20, 33, for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer ... be interposed between the citizen and the police...' <u>Wong Sun v. United States</u>, 371 U.S. 471, 481-482.
> <u>United States v. Katz</u>, 389 U.S. 347, superseded on other grounds, <u>United States v. Koyomejian</u>, 946 F.2d 140 (9th Cir. 1991).

Here, the corpus of the crime had been committed, the same crime that was described by the citizen. The arrests had been made. There was no need to enter the trailer as the evidence had been found at the exit of the trailer park.

The Supreme Court has said "We have had frequent occasion to point out that a search may not be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." <u>United States v. Di Re</u>, 332 U.S. 581, 592 (1948).

This is akin to cases where even in plain view or plain sight cases when the agent see something incriminating, such as the stolen stereo through an apartment window, the agent must still have a lawful right of access to the item before seizing it. Here, the agents did not even have any view of something incriminating, and it follows they had no right of access to anything in the trailer. <u>United States v. Naugle</u>, 997 F.2d 819 (10th Cir. 1993); <u>Bilida v. McCleod</u>, 211 F.3d 166 (1st Cir. 2000).

Also, as with the plain-view doctrine or the plain touch doctrine the *incriminating character* of the item must be *immediately*

1

2    *apparent*. <u>Minnesota v. Dickerson</u>, at 375, relying on <u>Arizona v. Hicks</u>,

3    480 U.S. 321 (1987).

4        Additionally, the agents conduct here also violated the laws of

5    California.[1]  The California Supreme Court has held that officers, after

6    having made a proper traffic stop, cannot, on a mere hunch, properly ask

7    for consent to search.  The consent is vitiated because the detention is

8    unlawfully continued after any lawful and proper purpose has passed.

9    <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005); <u>People v. Lusardi</u>, 228 Cal.

10   App. 3d Supp. 1 (1991).  *And see:* <u>People v. Lingo</u>, 3 Cal. App. 3d 661

11   (1970)(where the police had concluded their lawful stop of a vehicle,

12   further detention of car's occupants was not lawful, nor was request to

13   search).

14       There is nothing here that would have led a reasonable person

15   to believe that a search of this trailer would have a fair probability

16   of revealing evidence. <u>Dawson v. City of Seattle</u>, 435 F.3d 1054, 1062 (9th

17   Cir. 2006).  The stop of a vehicle leaving the campground had already

18   occurred and numerous people had been detained.  The stop, illegal or

19   not, revealed the illegal aliens and other than this, there was no other

20   probable cause. <u>Minnesota v. Dickerson</u>, 508 U.S. 366, is apt, where the

21   Supreme Court outlined its holding at pp. 377-379.

22                          Once again, the analogy to the plain-view
23              doctrine is apt.  In *Arizona v. Hicks*, 480 U.S. 321... (1987),
                this Court held invalid the seizure of stolen stereo equipment
24              found by police while executing a valid search for other
                evidence.  Although the police were lawfully on the premises,
25              they obtained probable cause to believe that the stereo
                equipment was contraband only after moving the equipment to
26              permit officers to read its serial numbers.  The subsequent
                seizure if the equipment could not be justified by the plain-
27

28   _____

     [1]Mr. Kennedy hereby reserves his right to raise this state law claim.
     <u>United States v. Mendez</u> (II), 476 F.3d 1077 (9th Cir. 2007).

view doctrine, this Court explained, because the incriminating character of the stereo equipment was not immediately apparent; rather, probable cause to believe that the equipment was stolen arose only as a result of a further search – moving of the equipment – that was not authorized by a search warrant or by any exception to the warrant requirement. The facts of this case are very similar. Although the officer was lawfully in a position to feel the lump in respondent's pocket, because <u>Terry</u> entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was no immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that flowed is likewise unconstitutional. *Horton*, 496 U.S. at 140. <u>Id.</u> at 378-379.

Like <u>Minnesota v. Dickerson</u>, whether the object's incriminating character is immediately apparent and whether the officers have a lawful right of access to the object is at issue. As we see, in <u>Arizona v. Hicks,</u> even though the officers knew the stereo was stolen, they only knew this *after* they conducted the unlawful search, *i.e.* by moving the stereo, which they were not authorized to do, just as in this case there was no justification or probable cause for the seizure of the occupants of the trailer, nor was there any justification for the search. Thus, everything from the illegal search and seizure must be suppressed in addition to all statements and evidence derived from the unlawful seizure and search.

Furthermore, the California Supreme Court has held that officers, after having made a proper traffic stop, cannot, on a mere hunch, properly ask for consent to search. The consent is vitiated because the detention is unlawfully continued after any lawful and proper purpose has passed. <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005); <u>People v. Lusardi</u>, 228 Cal. App. 3d Supp. 1 (1991). *And see:* <u>People v. Lingo</u>, 3

Cal. App. 3d 661 (1970)(where the police had concluded their lawful stop of a vehicle, further detention of car's occupants was not lawful, nor was request to search). Here, the stop had occurred, and there was no reason to then request to search the trailer, a hundred to several hundred yards away from the stopped car.

As a result of the unlawful arrest, the evidence and statements stemming from the arrest must be suppressed. This would include the alleged statements made by Mr. Kennedy to the Border Patrol, any objects taken from the trailer or his person, and presumably, the two people found within the trailer as they are the fruits of the unlawful search and arrest. Taylor v. Alabama, 457 U.S. 687 (1982)(No probable cause where arrest based on insufficient tip did not provide probable cause to obtain a warrant or to arrest defendant and thus subsequent confession and fingerprints were suppressed); Payton v. New York, 455 U.S. 573 (1980); Wong Sun v. United States, 371 U.S. 471 (1963).

**IV.**

**MOTION TO SUPPRESS IDENTIFICATION**

It has been held repeatedly that admission of pre-trial identifications violates due process of law when the identification process creates a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir. 1985).

The out-of-court identification of Mr. Kennedy, made by a material witness and any photographs taken in this case must be suppressed.

In evaluating identification procedures used by law enforcement, the court must consider the totality of the circumstances. Stovall v.

Denno, 388 U.S. 298, 302 (1967).  If the out-of-court identification procedure is found to be impermissibly suggestive, any in-court identification must be suppressed unless it is found independently reliable.  Foster v. California, 394 U.S. 440 (1969).

On the day he was charged for the current offense, with the four material witnesses and two other defendants, the officers responsible for Mr. Kennedy's arrest chose to have this material witness seated across from Mr. Kennedy for a number of hours, no more then six or seven feet away from him, probably just four feet away.  He was cuffed to the bench or seat he was sitting on and he was alone.  The agents then asked this material witness to identify him in a line-up of photographs they showed to her, and asked her if he had seen him or been arrested with him.  Assuming the photos she was shown were those of Mr. Kennedy, her identification is tainted as she was sitting across from him for hours and because the agents were leading her into the very answers they wanted, to obtain an identification, some of which is outlined in italics below.

"The practice ov showing suspects singly to persons for the sole purpose of identification, and not as part of a line-up, has been widely condemned."   Stovall v. Denno, supra, 388 U.S. at 302.

The factors that go towards accuracy of in identification must be "weighed" against "the corrupting effect of the suggestive identification itself." Maison v. Braithwaite, 432 U.S. 98, 114 (1977); United States v. Miguel, 49 F.3d 505 (9th Cir. 1995).

It is clear from the facts just listed that this "identification" if it really was meant as Mr. Kennedy's, is the epitome of an impermissibly suggestive procedure.  The mere factor that this

person sat across from Mr. Kennedy for hours creates a highly suggestive situation which would likely lead a person to believe that this person was arrested with you and is the one that law enforcement authorities want you to believe is responsible for the crime.

*The agent asked the witness if she had seen these people again, and she said,* "Yes, they are here with us.  I am not sure ..."

The agent then said: *Is he here with you.  Was he arrested?*

Ms. Martinez responded: I have not seen him.

The agent persisted: *Did he get arrested when you were arrested?*

Ms. Martinez said: Yes.

The agent then asked her: *Maria, did we promise you anything, make any threats against you to speak with us?*

Ms. Martinez: No.

Essentially the agents were testifying for the witness, asking her to merely confirm there own conclusions, to which she would respond something like, "I believe so."  Such leading testimony would not be permitted at trial, because of its misleading nature and failure to establish a foundation and in some instances, the failure to prove the statements were based on the witness' personal knowledge as opposed to the agents desired answers to build their case.

Since the out-of-court identification procedures were impermissibly suggestive and taint the in-court identification of Mr. Kennedy, the identification is not independently reliable and should be suppressed.  In the alternative, the Court should hold a hear ing to determine the reliability of the in-court identification.

V.

1

2

3
**THE AGENTS FAILED TO COMPLY WITH THE KNOCK-NOTICE REQUIREMENTS OF THE FOURTH AMENDMENT**

4

5
The Fourth Amendment mandates that police officers entering a

6
dwelling pursuant to a search warrant announce their purpose and

7
authority and either wait a reasonable amount of time to be refused

8
admittance before forcibly entering a residence. <u>United States v.</u>

9
<u>Bynum,</u>362 F.3d 574, 579 (9th Cir, 2004); <u>Wilson v. Arkansas</u>, 514 U.S. 927,

933-35 (1995); 18 USC section 3109.

10

11
"The common-law principle that law enforcement officers must

12
announce their presence and provide residents an opportunity to open the

13
door is an ancient one." <u>Hudson v. Michigan</u>, 547 U.S. 586, 589.  The few

14
excuses that permit an officer to avoid knocking and giving notice were

15
not at issue here, as there was no threat of destroying evidence and

16
there were no exigent circumstances to believe that weapons may have been

present or available.

17

18
Here, the agents had no idea what or who they would find in the

19
trailer or if a crime was occurring in the trailer.  They just went to

20
open the door to conduct a broad-based, non-specific search and to seize

21
and interrogate anyone who might be in the trailer, if there were any

22
people.  They failed to announce themselves and their purpose.  This is

23
not reasonable.  This was simply an illegal, warrantless entry, arrest

and search. <u>New York v. Harris</u>, 495 U.S. 14 (1990).

24
**VI.**

25
**There Was No Genuine Consent To A Search of the Trailer**

26
The government bears the burden of proving that "consent" was

27
voluntary. <u>United States v. Davis</u>, 482 F.2d 893, slip.op. at 31 (9th Cir.

28
1973).  Consent is derived from the careful scrutiny of each case. <u>Id.</u>

Whether or not valid consent was given is determined using a "totality of the circumstances test. Schneckloth v, Bustamonte, 412 U.S. 218, 227 (1973).

The government argues that one agent asked for and was granted consent to to enter the premises and search for more illegal aliens by Matthew Kennedy. Assuming this is true, and the defense asserts it is not, this does not mean Mr. Kennedy agreed. Mere acquiescence or non-resistance to the demand of the agents to search is not consent. Johnson v. United States, 333 U.S. 10 (1948); United States v. Spires, 3 F.3d 1234, 1237 (9th Cir. 1993); United States v. Shaibu, 920 F.2d 1423 (9th Cir. 1990); United States v, Chan-Jimenez, 125 F.3d 1324 (9th Cir. 1997). Not only did Mr. Kennedy not know he could refuse the agents' alleged request for admission, he was never asked for his permission.

"The existence of consent to search is not lightly to be inferred." United States v. Pattachia, 602 F.2d 218, 219 (9th Cir, 1979). The government bears the burden to prove consent was valid. Florida v. Royer, 460 U.S. 491, 497 (1983). *Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion fact.*" United States v. Shaibu, 920 F.2d 1423 (9th Cir. 1989) citing United States v. Page, 302 F.2d 821, 83-84 (9th Cir. 1962); United States v. Chan-Jimenez, *supra*. Coercion can be express or implied, and is a question for the trier of fact to be determined by the totality of the circumstances. United States v. Davis, 482 F.2d 893 (9th Cir. 1973).

Valid consent is frequently determined by examining the following factors: **First**. Whether the person is detained. No doubt because there were two armed, uniformed agents who told Mr. Kennedy their

colleagues had just arrested a car full of undocumented people. United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988); United States v. Martinez-Fuertes, 428 U.S. 543 (1976). **Secondly**, were Miranda warnings given?  No.  **Third**, were guns drawn? **Fourth, w**as Mr. Kennedy told he could refuse to consent?  No.  Even assuming he was asked for consent, he was never told nor did he know that he could refuse to consent to let the`agents in.  **Five** was Mr. Kennedy told that the agent could obtain a search warrant?  No.

None of the factors cited here show that there was valid consent, thus the ensuing search and seizure was unlawful and everything should be suppressed.

The fact pattern here implicates Bumper v. North Carolina, 391 U.S. 543 (1968) where the Supreme Court found that a defendant's consent given after an illegal arrest may be more properly characterized as the product of undue coercion which vitiates the consent.

VII.

**THE COUNTS INVOLVING SEIZURES OF MR. KENNEDY ON JANUARY 13, 2008, JANUARY 27, 2008, FEBRUARY 7, 2008 AND FEBRUARY 14, 2008 SHOULD BE DISMISSED**

**A.       The Stop of the Vehicles in Each of these Incidents was Unlawful**

On January 13, 2008, a Border Patrol Agent saw a grey car being loaded with a group of people about one mile north of the Tecate port of Entry and ten miles east of Campo, California.  Five minutes later a different agent said he saw a grey car traveling east on Highway 94, "matching the given description."  The agent saw a single driver talking on the phone and the vehicle appeared to be heavily laden.  The agent stopped the vehicle and he says he saw people crouching within the vehicle.  The driver, Matthew Kennedy, was not prosecuted.

1

2      This stop was unlawful as there is no founded connection between

3  the siting of a grey vehicle by one agent and the siting of another grey

4  vehicle five minutes later by a different agent.  Grey vehicles are a

5  dime a dozen, in fact silver-colored vehicles are the most common in this

6  country.  The dispatch tapes or radio recordings would shed light on

7  this, but the burden of establishing reasonable suspicion is on the

8  government and the radio dispatches have even been asked for in

9  discovery.  Without more, a man driving a vehicle  talking on a cell

10  phone does not establish reasonable suspicion to stop him.  This count

11  should be dismissed.

12  **B.        The Counts Involving Allegations Occurring on January 13, 2008,**
           **January 27, 2008, February 7, 2008 and February 14, 2008 Should**
13         **Be Dismissed Because There is No Corpus Delicti and Because the**
           **Government has Tampered With and Destroyed Evidence**
14

15      The counts dated January 13, 2008, January 27, 2008, February

16  7, 2008 and February 14, 2008 warrant dismissal because the government

17  has not provided any witnesses or *corpus* of the crime: there are no

18  illegal aliens, just reports saying there were, and they have not been

19  spoken to by the defense, nor can they be crossed examined.  Presumably

20  they have been deported or voluntarily returned to their home country as

21  the discovery suggests.  Thus, to maintain this count would violate Mr.

22  Kennedy's right to Due Process, to Have Competent Counsel, to Confront

23  the Witness being used against him and to be tried on evidence that might

24  amount to proof beyond a reasonable doubt. *See, e.g.,* United States v.

25  Cronic, 466 U.S. 648 (1984) "The right to the effective assistance of the

26  accused to require the prosecution's case to survive the crucible of

27  meaningful adversarial testing.  When a true adversarial criminal trial

28  has been conducted – even if defense counsel may have made demonstrable

errors – the kind of testing envisioned by the Sixth Amendment has occurred.   But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *And see* United States v. Tucker, 716 F.2d 576, 58 (9th Cir. 1983)

Because there are no people here, the government cannot prove these counts and to maintain these counts against Mr. Kennedy would violate his fundamental due process rights, right to counsel and right to confrontation.

The fundamental holding of the Supreme Court in Crawford v. Washington applies here: the admission of "testimonial" hearsay statements used against an accused is prohibited where the declarants, as in this case, are unavailable, and the defense has not had an opportunity to cross examine the declarant at the time the statements were made. 124 S.Ct. 1354 (2004).

The count must be dismissed because the government's failure to prosecute Mr. Kennedy on these alleged occasions amounts to a "waiver" given that it has destroyed the evidence without having Mr. Kennedy legal counsel or an opportunity to test or investigate or even verify there was evidence against him.

In short, by maintaining these counts against Mr. Kennedy, the government is receiving a windfall by not having to maintain its burden of proof, by getting rid of evidence and by circumventing Mr. Kennedy's right to defend himself.

Moreover, these Counts can be characterized as improper "404b" evidence that are being used to maintain counts against Mr. Kennedy that should be established by proof beyond a reasonable doubt and by allowing the defense to defend against them, which involves its ability to

investigate the corpus and the witnesses of this crime.  If the counts are maintained, the government would be incorrectly relying on a police report to convict someone and deprive him of his liberty.

The defense directs it attention to Federal Rule of Evidence, Rule 803(8).  All that was generated to the defense concerning these particular counts were police reports.  As it is hearsay, and because it is a police report, and because it was made in anticipation of litigation, it should not be permitted to be used at trial against Mr. Kennedy.  Federal Rule of Evidence, Rule 803(8).  While the federal rules prohibit the use of hearsay, exceptions are outlined in section 803 of the Federal Rules of Evidence [FRE], none of which apply here.  The defense directs the Court's attention to FRE 803(8) which permits the use of hearsay if they are public records but not if they are police reports:

> **Public records and reports**.  Records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the official or the agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding however, in criminal cases matters observed by police officers and other law enforcement personnel....* Id. (Italics added).

In short, it is not Constitutional to convict someone based on a police report, with no corpus or opportunity to investigate the witnesses, their backgrounds or to interview them.  Who knows if they gave the Border Patrol their real identities and the addresses they supposedly gave the Border Patrol were blacked out so the defense cannot see them and, in any case, they are probably fake.  Even if they were given to the defense, they are now out of the jurisdiction and out of reach of the subpoena power as the agents "destroyed" the evidence by their deportations and they are not reliable pieces of evidence (there

is no foundation for their veracity nor confirmation) and thus it would violate Mr. Kennedy's right to a defense, to confront witnesses and to have competent legal assistance from counsel to defend against these witnesses who have been tampered with by the government who have returned them to their country of origin.

The reason to preclude police reports as evidence at trial is clear, as here, because of the bias of the party opponent, *i.e.* the police, making its case in the police reports, and the un-cross-examined statements of the witnesses who are long gone. Both factors cause this "evidence" to be overwhelmingly unreliable to use against a defendant in a criminal trial. They probably would not even be admissible in a civil trial.

It follows, then that the *corpus delicti* rule applies here: there are no people, and the police reports are not admissible, leaving only an alleged statement by Mr. Kennedy which is in and of itself unreliable as an involuntary, unwarned statement. <u>United States v. Figueroa-Comacateco</u>, 2008 U.S. App. LEXIS 7847 (2008)("Corpus delicti evidence is required only when a confession is the sole basis for a conviction.). The government must produce some independent, corroborating evidence. *And see* Federal Rules of Appellate Procedure, Rule 32, authorizing the citation of unpublished cases.

Finally, the government made its decision to decline prosecution of those offenses as stated in their reports for example, as set forth on page 46 of the discovery describing the January 13 incident: "Prosecution for 8 USC section 1324 was declined, as it does not meet established guidelines." The same occurred in all the other incidents as set forth on pages 50, 52 and 57. Moreover, the government notified

the defendant they were declining prosecution, thus it has waived its right to hale someone into court who has been told he would not be prosecuted and then turns around and deprives him the opportunity to have legal assistance and counsel, to investigate the evidence and the witnesses that are being used to convict him.

**VIII.**

**ANY STATEMENTS MADE BY MR. KENNEDY AT ANY OF HIS DETENTIONS MUST BE SUPPRESSED**

A.        **The Government Failed to Comply With Miranda**

Mr. Kennedy was not Mirandized before his statements and evidence were unlawfully taken from him.  Accordingly, all of his statements must be suppressed because of the illegal search and seizure.

1.                **Miranda Warnings Must Precede Custodial Interrogation.**

The Supreme Court has held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  Id.; see Orozco v. Texas, 394 U.S. 324, 327 (1969).

A suspect will be held to be in custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe he could not freely leave.  See United States v. Lee, 699 F.2d 466, 468 (9th Cir. 1982);

1
2  United States v. Bekowies, 432 F.2d 8, 12 (9th Cir. 1970).  Here, Mr.
3  Kennedy was in custody as soon as the agents opened the door to the
4  trailer by Border Patrol agents at which point he was not free to leave
5  the checkpoint.
6      Once a person is in custody, Miranda warnings must be given
7  prior to any interrogation.  See United States v. Estrada-Lucas, 651 F.2d
8  1261, 1265 (9th Cir. 1980).  Those warnings must advise the defendant of
9  each of his or her "critical" rights.  United States v. Bland, 908 F.2d
10 471, 474 (9th Cir. 1990).  If a defendant indicates that he wishes to
11 remain silent or requests counsel, the interrogation must cease.
12 Miranda, 384 U.S. at 474.  See also: Edwards v. Arizona, 451 U.S. 484
13 (1981).
14     Mr. Kennedy was interrogated when the Border Patrol came to the
15 trailer and while he was held by the Border Patrol and while the trailer
16 was searched.  The Border Patrol also interrogated Mr. Kennedy each time
17 they stopped him on January and February.  As Mr. Kennedy's rights were
18 violated, all statements must be suppressed as they were taken in
19 violation of the dictates of Miranda.
20 **B.**    In addition, th**e Government Must Demonstrate That Mr. Kennedy's
21       Statements Were Made Voluntarily, Knowingly, and Intelligently.**
22     When interrogation continues without the presence of an
23 attorney, and a statement is taken, a heavy burden rests on the
24 government to demonstrate that the defendant intelligently and
25 voluntarily waived his privilege against self-incrimination and his right
26 to retained or appointed counsel.  Miranda, 384 U.S. at 475.
27     There was no waiver fny of those arrests, written or otherwise.
28 Mr. Kennedy was questioned by various agents.  All of his statements must

be suppressed.

Furthermore, it is undisputed that a waiver of the right to remain silent and the right to counsel must be made knowingly, intelligently, and voluntarily in order to be effective. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973). The standard of proof for a waiver of this constitutional right is high. <u>Miranda</u>, 384 U.S. at 475. <u>See United states v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is great, the court must indulge every reasonable presumption against waiver of fundamental constitutional rights).

A defendant in a criminal case is deprived of due process of law if the conviction is founded upon an involuntary confession. <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991); <u>Jackson v. Denno</u>, 378 U.S. 368, 387 (1964). The government bears the burden of proving that a confession is voluntary by a preponderance of the evidence. <u>Lego v. Twomey</u>, 404 U.S. 477, 483 (1972).

The standard for determining if a confession was voluntarily given is whether "the confession is a product of an essentially free and unconstrained choice by its maker." <u>Beecher v. Alabama</u>, 499 U.S. 279 (1991). In determining whether a defendant's will was overborne in a particular case, the totality of the circumstances must be considered. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).

Here, Mr. Kennedy was arrested in a trailer in a remote area of the Eastern area of San Diego County by armed, uniformed officers. While searching the car and his person, the agents' reports are devoid of any mention of a reading of <u>Miranda</u> rights yet Mr. Kennedy was questioned without being given the choice of remaining silent. With regard to the other counts, again, Mr. Kennedy did not make a knowing, intelligent or

1

2  voluntary waiver of his <u>Miranda</u> rights .

3  **A.**    **The Statements Made to the Interrogating Agent At the Border**
          **Patrol Office Were Tainted by the Initial Unlawful Search,**
4          **Seizure and Interrogation of Mr. Kennedy at the Trailer**

5          Any statement made by Mr. Kennedy to interrogating agents at the

6  trailer should be suppressed because they are the fruit of unlawful

7  government activity, including the unlawful search, the unlawful

8  detention of Mr. Kennedy and the illegal extraction of his statements.

9          The pivotal question in determining attentuation is "whether,

10 granting establishment of the primary illegality, the evidence .. has

11 been come at by exploitation of that illegality or instead by means

12 sufficiently distinguishable to be purged of the primary taint." <u>Wong Sun</u>

13 <u>v. United States</u>, 371 U.S. 471, 487-488 (1963).

14         In order to determine if the statements were a result of the

15 exploitation of the search, seizure and initial "confession," the Court

16 is to consider three factors: 1. The temporal proximity of the original

17 illegal government conduct to the statements; 2. The presence of any

18 intervening circumstances and 3. The "purpose and flagrancy" of the

19 official misconduct. <u>Brown v. Illinois</u>, 422 U.S. 590, 603-604 (1975).

20         Once a defendant comes forward with some specific evidence

21 demonstrating taint, the burden of proof that the taint was attenuated

22 enough belongs to the government. <u>United States v. Cella</u>, 568 F.2d 1266,

23 1284 (9th Cir. 1977).

24                        **1. Temporal Proximity**

25         Here, there was no significant intervening time between the

26 unlawful search, seizure and extraction of Mr. Kennedy's statements and

27 the second set of statements that were taken after he was taken to the

28 Border Patrol.  In addition, he had been apprehended other times by the

Border Patrol where each time the agents caused him to speak without proper admonitions and involuntarily and under coercion. *See*: United States v. Crawford, 2003 DJDAR 2528, 2533 (March 6, 2003) *and see*: Taylor v. Alabama, 457 U.S. 687, 691 (six hours not sufficient to purge taint) and United States v. George, 883 F.2d 1407, 1416 (9th Cir. 1989) ("As best as we are aware, no court has weighed the first factor against a defendant when his inculpatory statement followed illegal police conduct by only a few hours.").

### 2. Intervening circumstances

Secondly, there were no intervening circumstances that would purge the taint, such as an arraignment, or an opportunity for Mr. Kennedy to speak with a lawyer.  In this analysis, the Court is not to consider the defendant's state of mind.  Rather, we look for intervening acts of significance that "render inapplicable the deterrence and judicial integrity purposes that justify excluding [a tainted] statement." Crawford, at 2533, citing Brown, 422 U.S. at 599, 600.

The intervening circumstances must be important. Id. Here, there were no intervening circumstances.  Mr. Kennedy was just taken from the trailer where no Miranda warnings were given by the Border Patrol agent that interrogated him.  He spoke with no attorney and no judge advised him of his rights.  Instead he remained the entire time on the custody of the Border Patrol agents.

Indeed, if it is true that they released Mr. Kennedy this many times, makes the assertion that there was a genuine, valid waiver even more suspect, particularly in light of the fact there are no written waivers.

### 3. Purpose or Flagrancy of the Official

**Misconduct**

With regard to the third prong, purpose or flagrancy, the unlawful arrest, by armed officers, who entered the trailer without permission or notice and who conducted a search which was not supported by probable cause or consent, and which resulted in unlawfully extracted non-Mirandized statements from Mr. Kennedy was clearly a flagrant use of unlawful force that produced statements. Accordingly, this prong, too, weighs in favor of suppression of all of the evidence (the aliens) and statements made by Mr. Kennedy.

D.        **This Court Should Conduct An Evidentiary Hearing**.

It is anticipated that the government will argue that it need not present evidence in support of its position that the voluntariness/ <u>Miranda</u> motion should be denied because the defense has not submitted a declaration.  The government's position is contrary to the framework established in <u>Miranda</u>.  First, requiring the defense to come forward with factual information shifts the burden of proof.  It is the government, not the defense, that bears the burden of proof.

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant <u>unless it demonstrates</u> the use of procedural safeguards effective to secure the privilege against self-incrimination.

<u>Miranda v. Arizona</u>, 384 U.S. at 444 (emphasis added).  Thus, far from requiring the defense to come forward with anything, <u>Miranda</u> squarely places the burden on the government.

Similarly, it is the government that bears the burden of proving a valid waiver.

> If the interrogation continues without the presence of an attorney and a statement is taken, <u>a heavy burden</u>

<blockquote>
rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.
</blockquote>

Id. at 475 (citing Escobedo v. Illinois, 378 U.S. 478, 490 n.14 (1963) (emphasis added)).

This "heavy burden," id., cannot be met absent evidence of proper warnings and a knowing and intelligent waiver.

<blockquote>
"Presuming a waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver."
</blockquote>

Id. (quoting Carnley v. Cochran, 369 U.S. 506, 516 (1942) (emphasis added)). Thus, both an allegation and evidence are required.

The government's anticipated contention that there are no contested factual issues is also wrong.

<blockquote>
Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so.
</blockquote>

Id. at 476 (emphasis added).

In short,

<blockquote>
[t]he warnings required and the waiver necessary in accordance with [the Miranda] opinion . . . are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.
</blockquote>

Id. If the government fails to meet these requirements, the statements are not admissible. Merely claiming, in a responsive pleading, that warnings were provided and that there was a waiver is simply inadequate.

> In dealing with custodial interrogation, we will not presume that a defendant has been effectively apprised of his rights and that his privilege against self-incrimination has been adequately safeguarded on a record that does not show that any warnings have been given or that any effective alternative has been employed. Nor can a knowing and intelligent waiver of these rights be assumed on a silent record.

Id. at 498-99.  Consequently, this Court should require the government to prove its case.

In addition, this Court must also determine whether the warnings provided were adequate.  See United States v. Bland, 908 F.2d 471, 473-74 (9th Cir. 1990), cert. denied, 113 S. Ct. 170 (1992); United States v. Noti, 731 F.2d 610, 614-15 (9th Cir. 1984).  If no evidence of the content of warnings is presented, this Court cannot meet this obligation.

This Court is also required to conduct an evidentiary hearing under 18 U.S.C. § 3501(a) to determine, outside the presence of the jury, whether any statements made by Mr. Kennedy are voluntary.

Moreover, section 3501(a) requires this Court to make a factual determination.  Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12.  See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

**IX.**

**MR. KENNEDY REQUESTS ALL EVIDENCE USED IN PROCUREMENT AND EMPLOYMENT OF ANY WIRETAPS ASSOCIATED WITH THIS CASE**

So far, there is no indication in the view of the defense that a wire tap has been utilized in this case.  In any event, Mr. Kennedy requests production of any and all evidence stemming from any wiretap used in this matter, which may have been acquired prior to or after Mr. Kennedy's arrest.  This request includes but is not limited to any and all applications for wiretaps, affidavits in support of such applications, the identities of persons or institutions making such requests or applications, the identities of persons or institutions authorizing the applications, all evidence stemming from such wiretaps, all reports and subsequent applications or reapplications, and the nature of the facility from which the wiretap took place. 18 U.S.C. sections 2510; 2515; 2518(1),(2),(4),(5), (6),(8),(9),(10),(11); 2519 (1),(2),(3); United States v. Chaney, 416 U.S. section 562 (1974); United States v. Gardenia, 416 U.S. 505 (1974); United States v. Kahn, 415 U.S. 143 (1973) (basis for probable cause to authorize the wiretap); Scott v. United States, 425 U.S. 917 (1976) (requirement of "minimization provision."); Franks v. Delaware, 438 U.S. 154 (1978); United States v. Leon, 468 U.S. 897 91986); Illinois v. Gates, 462 U.S. 213 (1987); United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir. 1988) (requirement of necessity and proper procedures); United States v. Stewart, 762 F.2d 775 (9th Cir. 1988); United States v. Brown, 761 F.2d 1272 (9th Cir, 1985).

Mr. Kennedy also requests information concerning any and all arrests, convictions or trials resulting from interceptions. 18 U.S section 2519 (1),(2),(3).  Mr. Kennedy specifically requests leave to file further motions based on the information derived from this motion.

**X.**

**MOTION FOR JOINDER**

Mr. Kennedy respectfully asks the Court to allow him to join the motions filed by the two other defendants in this case.

XI.

## MR. KENNEDY REQUESTS LEAVE TO FILE FURTHER MOTIONS

Mr. Kennedy anticipates acquiring additional discovery that will support his motion to suppress evidence.  Accordingly he asks this Court to allow him to file further motions.

**XI.**
**CONCLUSION**

Respectfully submitted,

Dated:   May 19, 2008          /s/Joan Kerry Bader
                               JOAN KERRY BADER
                               Attorney for Mr. Kennedy

:\JKB\MOTN\2008\Kennedy.WPD